## WISCONSIN PUBLIC SERVICE CORPORATION v. UNITED STATES.

No. 4956.

District Court, E. D. Wisconsin.

July 30, 1941.

Miller, Mack & Fairchild, and Theodore C. Bolliger, all of Milwaukee, Wis., for plaintiff.

B. J. Husting, U. S. Dist. Atty., of Milwaukee, Wis., and George H. Zeutzius, Sp. Asst. to the Atty. Gen., for defendant.

DUFFY, District Judge.

This action is for recovery of one of two alternative sums paid for the purchase of documentary stamps, pursuant to provisions of § 800 et seq. of the Revenue Act of 1926, Ch. 27, 44 Stat. 99, and of Schedule A(1) of Title VIII, § 721 of the Revenue Act of 1932, 47 Stat. 272, 26 U.S.C.A. Int. Rev.Acts, pages 284, 288. Claims for refund were duly made. This action was promptly commenced after the Commissioner of Internal Revenue had denied the claims.

Plaintiff is a public utility corporation, organized under the laws of Wisconsin, and has its principal office and place of business in the city of Milwaukee and within the Eastern District of Wisconsin. It is a public service corporation within the meaning of Section 184.01, Wisconsin Statutes.

On October 2, 1922, the plaintiff corporation, being authorized to borrow money for its corporate purposes, executed a mortgage indenture with the First Wisconsin Trust Company, as trustee, to secure its "First Lien and Refunding Mortgage Gold Bonds" to be issued in series under certain conditions set forth in the indenture.

In connection with the acquisition of four utility properties and the financing thereof, the plaintiff on January 30, 1933, and on February 23, 1933, procured authority from the Public Service Commission of Wisconsin, pursuant to Chapter 184, Wisconsin Statutes, § 184.01 et seq., for the issuance and sale of $7,500,000 principal amount of its First Lien and Refunding Mortgage 6% Gold Bonds, Series C, to be secured by the First Lien and Refunding Mortgage dated October 2, 1922.

On March 1, 1933, plaintiff executed to the First Wisconsin Trust Company, as trustee, a supplemental indenture, creating Series C of its First Lien and Refunding Mortgage 6% Bonds. The indenture provided that the bonds would be dated March 1, 1933, and would mature March 1, 1959, and be limited in aggregate authorized principal amount at any time issued or outstanding to $40,000,000.

In 1933 the financial and security market was greatly upset, and prevailing conditions made inadvisable any attempt to distribute said bonds to the public as had theretofore been contemplated. Thereafter, on April 21, 1933, plaintiff procured authority from the Public Service Commission of Wisconsin to resort to temporary financing, by borrowing $6,375,000 on short term bank loans, said loans to be secured by the pledge of the $7,500,000 of Series C bonds previously authorized.

On June 5, 1933, plaintiff issued its $7,500,000 Series C 6% Gold Bonds, in registered form, dated as of March 1, 1933, and on the same date purchased $7,500 of documentary stamps and caused same to be affixed to the original mortgage indenture dated October 2, 1922, and caused said stamps to be cancelled. The bond issued by the plaintiff, denominated T-1, was in the form of a single typewritten "temporary bond exchangeable for a like amount of definitive bonds when ready for delivery". A permanent, or definitive bond, or a number of bonds in smaller denominations, never were issued or released to take the place of the temporary bond, although under the agreement of May 16, 1933, the banks lending the money might have demanded that this be done. On June 7, 1933, the banks loaned the plaintiff $6,375,000. The plaintiff's note was due in six months, and was thereafter renewed for several six months' periods.

The $7,500,000 of temporary series C bond thus pledged was dated March 1, 1933, and was payable on March 1, 1959, with interest at the rate of 6% per annum payable semi-annually. Both principal and interest were payable in gold coin of the United States equal to the standard of weight and fineness as existed on March 1, 1933. By reason of a commission, the money thus borrowed from the banks was costing the plaintiff about 7% per annum. Gradual improvement of financial conditions by 1935 made practical the payment of the bank loan, and the public distribution of plaintiff's Series C bonds.

To improve the marketability of the bonds under the conditions current in 1935 and by reason of certain intervening legislation, certain terms of Series C bonds were changed prior to public distribution. The interest rate was reduced from 6% to 5½%. It was provided that the principal

and interest be payable in gold coin of the United States equal to the standard of weight and fineness as of January 1, 1935; also that plaintiff would pay State taxes assessed, not exceeding two mills, on the bonds owned by persons residing in California; and that plaintiff would reimburse to the owners of said bonds the normal federal income tax, not exceeding 2%, paid by such owner by reason of interest derived from such bonds. In all other respects said Series C bonds remained in substantially the original form.

By orders entered on February 21 and on February 23, 1935, the Public Service Commission of Wisconsin amended its prior orders in relation to the Series C bonds, so as to authorize the modifications mentioned aforesaid, as well as the public distribution of $7,000,000 thereof, the balance of $500,000 to be cancelled on release of the pledge. On March 25, 1935, the plaintiff executed a supplemental indenture dated as of January 2, 1935, amending the provisions of the supplemental indenture dated March 1, 1933. Endorsement of the changes was made by the trustee on the pledged temporary Series C bond at the request and by the consent of the registered pledgee holder. Upon payment of the bank loan and the release of the pledged bonds, $500,000 thereof was cancelled and $7,-000,000 of Series C bonds in modified form were publicly sold.

In compliance with the ruling by the Deputy Commissioner of Internal Revenue, to the effect that the distribution of the modified Series C bonds were a new issue subject to a stamp tax, plaintiff on March 6, 1935, purchased $7,000 of documentary revenue stamps and on March 28, 1935, caused them to be affixed to an original counterpart of the original mortgage dated October 2, 1922, and cancelled same.

In the prospectus published for the benefit of prospective purchasers of the bond appears the following, under the heading "Purpose of Issue": "The net proceeds to be received by the Corporation, in cash for the sale of the $7,000,000 principal amount of Bonds from the several Underwriters, will be $6,405,000. Such proceeds will be used to pay the $6,375,000 of Bank loans of the Corporation."

On September 12, 1935, plaintiff filed its claim for refund of the $7,000 paid for the documentary stamps on March 26, 1935, and, on November 8, 1935, it filed its claim for refund of the $7,500 paid on the stamps purchased on June 5, 1933, in the event that its first claim should be rejected. Both claims were rejected by the Commissioner of Internal Revenue on July 8, 1936. The basis of the rejection is shown by the following quotation from the Commissioner's letter: "Where a corporation calls in the bonds issued by it and, in lieu thereof, issues new bonds bearing a different interest rate, there is no escaping the conclusion that another bond is issued with a somewhat different obligation of the corporation. Such new debentures on issue would come within the comprehensive terms of the law imposing the stamp tax on 'all bonds' issued by any corporation."

As to plaintiff's claim for $7,000, the question is whether the modifications in 1935 of plaintiff's bond then pledged by it to secure separate promissory notes held by banks, and the public distribution of the bonds upon release from pledge, constituted a new issue of bonds subject to the stamp tax imposed upon the issuance of bonds under schedule A(1), Title VIII of the Revenue Act of 1926, as amended by Section 721(a) of the Revenue Act of 1932.

As to alternative claim for $7,500, the question is whether (if plaintiff's claim is denied) the bonds, when originally pledged to banks in 1933, are by such denial determined to be not such evidences of indebtedness as to be subject to such stamp tax in 1933.

Section A(1), as far as material, provides: "Bonds of indebtedness: On all bonds, debentures, or certificates of indebtedness issued by any corporation, and all instruments, however termed, issued by any corporation with interest coupons or in registered form, known generally as corporate securities, on each $100 of face value or fraction thereof, 10 cents: Provided, That every renewal of the foregoing shall be taxed as a new issue: * * *."

The authority requested by plaintiff of the Public Service Commission on January 25, 1935, was to amend the bonds. On February 21, 1935, the Commission issued an "order amending certificates of authority". This and other orders of the Commission were all entered in the same proceeding, designated S.B. 2292, 2-S.B. 34. As far as the Commission was concerned, the bonds issued in 1935 were a modification of those authorized in 1933.

But the Commission had an entirely different problem before it, and its ap-

proach was necessarily different. Its determination can have little weight in deciding whether there was a new issue under the Federal Stamp Tax Law. In any event, State laws and administrative interpretations are not controlling on the incidents of federal taxation, at least in the absence of an expressed purpose in the latter to make them so. Palmer v. Bender, 287 U.S. 551, 53 S.Ct. 225, 77 L.Ed. 489; Morrow v. Scofield, 5 Cir., '116 F.2d 17; Koppers Coal & Transportation Co. v. United States, 3 Cir., 107 F.2d 706.

The plaintiff desired to raise money in 1933 in order to acquire certain other utilities. At first it contemplated a public offering of its bonds. But in March, 1933, the market was unfavorable. Therefore it arrangᵤd to borrow from certain banks. The issuance of the temporary bond of $7,-500,000 was necessary. It was pledged with the banks as security for plaintiff's notes. It served the corporate purpose of raising money. It was in registered form. Stamp taxes of $7,500 were due and payable. The fact that the bond was turned over to the banks as collateral, instead of being distributed to the public, doesn't make it any less a "bond of indebtedness", within the meaning of the Stamp Tax Law. It was a corporate security.

Although designated a temporary bond, it was never replaced by the substitution of a permanent bond. Certainly there can be little argument as to $500,000 which was cancelled. In any event, the government's right to collect on a bond designated as temporary cannot be defeated by failure to issue a permanent bond.

About two years after the issuance of the $7,500,000 bond, the plaintiff embraced the opportunity to save about $100,000 a year in interest and commission charges. Plaintiff arranged for a payment of the bank loan and a release of the pledged bond by utilizing the proceeds of the sale of $7,000,000 Series C bonds to the public. Although the dates of issue and maturity of the new bonds were the same as the original temporary bond, there were certain marked differences: the interest rate was 5½% instead of 6%; they could be sold for cash for 88% of par instead of 90%; the gold clause was necessarily changed because of intervening legislation; and there was a change favorable to bondholders who resided in California, putting them on a par with residents of several other States mentioned in the 1933 indenture.

Taxing statutes must be construed and given effect in the light of the taxing purpose they evidence. Burnet v. Harmel, 287 U.S. 103, 53 S.Ct. 74, 77 L.Ed. 199. Congress contemplated that the act in question should be broad and comprehensive in scope. Founders General Corp. v. Hoey, 300 U.S. 268, 57 S.Ct. 457, 81 L.Ed. 639; Cliffs Corp. v. United States, 6 Cir., 103 F.2d 77.

I conclude that the bonds issued by the plaintiff in 1935 were substantially changed, and that the corporate obligations were materially different from the 1933 bond, so that each was separately taxable when issued. When the 1933 bond for $7,500,000 was finally issued, it was solely for the purpose of being pledged to secure a loan of $6,375,000. The proceeds of the 1935 bond were used to pay that loan and to thus release the pledge.

Plaintiff's complaint must be dismissed.